DEBRA KAY LYLES, PLAINTIFF v. THE CITY OF CHARLOTTE AND MOTOROLA, INC.,
DEFENDANTS

No. 9426SC134

(Filed 5 September 1995)

**Municipal Corporations § 444 (NCI4th)— defendant partici-
pant in local government risk pool—right to assert govern-
mental immunity waived**

Defendant city's "risk management operations," carried out in
cooperation with Mecklenburg County and the local school
board, fell within the definition of a "local government risk pool"
as contemplated by N.C.G.S. § 160A-485(a), so that defendant
waived the right to assert governmental immunity in bar to plain-
tiff's action in which she contended that her police officer hus-
band's cause of death was the improper training he allegedly
received from defendant regarding use of a portable radio.

**Am Jur 2d, Municipal, County, School and State Tort
Liability §§ 37 et seq.**

· **Liability or indemnity insurance carried by governmen-
tal unit as affecting immunity from tort liability. 68 ALR2d
1437.**

**Validity and construction of statute or ordinance limit-
ing the kinds or amount of actual damages recoverable in
tort action against governmental unit. 43 ALR4th 19.**

Appeal by defendant City of Charlotte from order entered 20
October 1993 by Judge Marvin K. Gray in Mecklenburg County
Superior Court. Heard in the Court of Appeals 4 October 1994.

*James, McElroy & Diehl, P.A., by G. Russell Kornegay, III, and
Richard B. Fennell and William K. Diehl, Jr., for plaintiff-
appellee.*

*Smith Helms Mulliss & Moore, L.L.P., by L.D. Simmons, II,
Robert B. Cordle and Leigh F. Moran, for defendant-appellant
City of Charlotte.*

JOHN, Judge.

In this action brought pursuant to *Woodson v. Rowland*, 329 N.C.
330, 407 S.E.2d 222 (1991), defendant City of Charlotte (the City)

LYLES v. CITY OF CHARLOTTE

[120 N.C. App. 96 (1995)]

appeals the trial court's denial of its motion for summary judgment. More particularly, the City contends it neither purchased liability insurance covering plaintiff's claim nor participated in a "local government risk pool," and that it therefore was entitled to assert the defense of governmental immunity in bar to plaintiff's action. Accordingly, the City continues, the trial court committed reversible error by denying its motion for summary judgment on these grounds. We disagree.

Pertinent factual and procedural information is as follows: On the evening of 5 August 1990, Charlotte Police Officer Milus Terry Lyles (Lyles) and his partner Officer Villines (Villines) responded to a call involving a domestic dispute. At the scene, the officers arrested Calvin Cunningham (Cunningham), purportedly searched him for weapons, and, after he was handcuffed, placed him in the back seat of Lyles' squad car. Villines then drove away in a separate vehicle. As Lyles was transporting Cunningham to the Mecklenburg County Jail, the latter managed to retrieve a small pistol hidden on his person and shot the officer twice in the back. Although Lyles' bullet-proof vest prevented the shots from penetrating his body, the impact caused him to lose control of the squad car and crash into a parked dump truck.

According to allegations in the complaint, Lyles then exited the driver's seat and, following training received from the City's Police Department (the Department), moved towards the rear of the vehicle to call for assistance with his assigned Motorola portable radio. In accordance with standard instructions, he crouched down and pressed the "E" (emergency) button on the radio and stated "140 to Villines . . . 140." It is alleged that Lyles had been informed that depressing the "E" button would access "a clear channel to communicate with all police officers and the dispatcher." In reality, however, the portable radio "did not send his distress signal to the other officers," and as a consequence Lyles received no response. In conformity with his training, Lyles attempted to return to the front of the vehicle to summon help on the squad car radio. As Lyles passed the left rear window of the wrecked automobile, Cunningham fired another shot from the back seat, hitting Lyles in the right eye and killing him.

On 4 August 1992, plaintiff Debra Kay Lyles (Lyles' widow) filed the instant action against the City and Motorola, Inc., contending that a proximate cause of Lyles' death was the improper training he

LYLES v. CITY OF CHARLOTTE

[120 N.C. App. 96 (1995)]

allegedly received from defendants regarding use of the Motorola portable radio. Plaintiff further alleged the Department:

20. . . . had received complaints from officers prior to the death of . . . Lyles regarding malfunctioning of the emergency button, and knew that it did not function as . . . Lyles . . . had been trained. It intentionally did not take adequate steps, however, to ensure that the radios were operating properly.

21. The . . . Department knew at and before the time of . . . Lyles' death that the training it had given him, particularly the information regarding the functioning of the "E" button on the portable units, was inadequate and improper . . . . It intentionally did not take adequate steps, however, to ensure that the police officers were trained regarding the functioning of the radios.

22. The . . . Department knew that its officers would be governed in their reaction to distress and emergency situations by this training, and act in accordance with it. The . . . Department also knew that its officers would rely on the representations made regarding the functioning of the radio. The . . . Department knew, or should have known, that officers' reliance on this training and these representations would lead to situations in which it was substantially certain that an officer would be seriously injured or killed.

23. The . . . Department's conduct, in particular its failure to advise . . . Lyles that he should no longer rely on the training and information he had received regarding his portable radio unit, was a proximate cause of his death. . . . Lyles was shot while attempting to act in accordance with his training.

In answer to the complaint, the City raised numerous affirmative defenses, including "governmental and sovereign immunity." Thereafter, on 7 September 1993, the City moved for judgment on the pleadings pursuant to N.C.R. Civ. P. 12(c) (1990) or, in the alternative, for summary judgment "based solely on the affirmative defense of sovereign immunity." In support of its summary judgment motion, the City submitted the affidavits of the City's Deputy Finance Director Gregory C. Gaskins (Gaskins) and Frank T. Weber (Weber), Vice President of a regional insurance brokerage firm.

The trial court denied each motion by order entered in open court 20 October 1993 and signed 27 October 1993, stating the City "is not

LYLES v. CITY OF CHARLOTTE

[120 N.C. App. 96 (1995)]

immune from liability in this particular case and thus this Court has personal jurisdiction over Defendant [City]."

At the outset, we resolve plaintiff's argument that this appeal is premature and should be dismissed. While denial of summary judgment is generally considered interlocutory and not immediately appealable, *Hill v. Smith*, 38 N.C. App. 625, 626, 248 S.E.2d 455, 456 (1978), this Court has repeatedly held that when "the grounds for [a party's] motion for summary judgment are governmental immunity . . . the denial of [the] motion is immediately appealable." *Taylor v. Ashburn*, 112 N.C. App. 604, 606, 436 S.E.2d 276, 278 (1993) (citations omitted), *disc. review denied*, 336 N.C. 77, 445 S.E.2d 46 (1994); *see also Hickman v. Fuqua*, 108 N.C. App. 80, 82, 422 S.E.2d 449, 450 (1992) (citations omitted), *disc. review denied*, 333 N.C. 462, 427 S.E.2d 621 (1993); *see also* N.C. Gen. Stat. § 1-277 (1983). Accordingly, we examine the merits of the City's appeal.

The City contends it waived governmental immunity neither through participation in a "local government risk pool" nor by purchasing liability insurance covering plaintiff's claim, and that denial of summary judgment in its favor was therefore error. Because we determine the City's "risk management operations" fall within the definition of a "local government risk pool" as contemplated by our General Assembly, however, we uphold the court's ruling and decline to address the issue of liability coverage.

A party moving for summary judgment bears the burden of establishing the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law. *Normile v. Miller and Segal v. Miller*, 63 N.C. App. 689, 692, 306 S.E.2d 147, 149 (1983) (citation omitted), *modified on other grounds and aff'd*, 313 N.C. 98, 326 S.E.2d 11 (1985); *see also* N.C.R. Civ. P. 56 (1990). A defendant who moves for summary judgment may meet this burden by showing either that (1) an essential element of plaintiff's claim is nonexistent; (2) plaintiff cannot produce evidence to support an essential element of its claim; or (3) plaintiff cannot surmount an affirmative defense raised in bar of its claim. *Taylor*, 112 N.C. App. at 606-07, 436 S.E.2d at 278 (citation omitted).

In the case *sub judice*, the City contends the uncontradicted affidavits offered in support of its motion established plaintiff's inability to overcome the affirmative defense of governmental immunity.

The common law doctrine of governmental immunity insulates a city or county from liability for injuries arising from governmental (as opposed to proprietary) activities. *See, e.g., Gregory v. City of Kings Mountain,* 117 N.C. App. 99, 103, 450 S.E.2d 349, 352 (1994). In other words, a municipality is not generally liable for torts committed by its officers and employees while performing governmental functions. *Young v. Woodall,* 119 N.C. App. 132, 135, 458 S.E.2d 225, 228 (1995) (citation omitted).

Governmental functions have been described as "discretionary, political, legislative, or public in nature and performed for the public good in behalf of the State . . . ." *Britt v. Wilmington,* 236 N.C. 446, 450, 73 S.E.2d 289, 293 (1952); *see also Clark v. Scheld,* 253 N.C. 732, 735, 117 S.E.2d 838, 841 (1961) (Governmental activities are those which promote or protect the "health, safety, security or general welfare of [a municipality's] citizens.") (citation omitted). "Ordinarily, a municipality providing police services is engaged in a governmental function . . . ." *Coleman v. Cooper,* 89 N.C. App. 188, 192, 366 S.E.2d 2, 5 (citation omitted), *disc. review denied,* 322 N.C. 834, 371 S.E.2d 275 (1988).

In her complaint, plaintiff alleged Lyles was killed as the result of improper training by the City's agents regarding operation of his portable Motorola radio. We agree with the City that the training and supervision of officers by a police department are embraced within the concept of "provi[sion] [of] police services"—a governmental function. *Id.* Accordingly, the City would ordinarily be immune from liability for torts committed by its officers and agents while engaged in instructing Lyles in the emergency use of a portable radio.

However, N.C. Gen. Stat. § 160A-485 (1994) "establishes an exception to the common-law rule." *Wiggins v. City of Monroe,* 73 N.C. App. 44, 49, 326 S.E.2d 39, 43 (1985); *see also Galligan v. Town of Chapel Hill,* 276 N.C. 172, 175, 171 S.E.2d 427, 429 (1970) (in the absence of statutory authority, a municipality cannot waive governmental immunity). In pertinent part, the statute provides:

(a) Any city is authorized to waive its immunity from civil liability in tort by the act of purchasing liability insurance. Participation in a local government risk pool pursuant to Article 23 of General Statute Chapter 58 shall be deemed to be the purchase of insurance for the purposes of this section. Immunity

shall be waived only to the extent that the city is indemnified by the insurance contract from tort liability.

G.S. § 160A-485(a).

Therefore, "a municipality may waive governmental immunity by the purchase of liability insurance." *Davis v. Messer*, 119 N.C. App. 44, 52, 457 S.E.2d 902, 907 (1995) (citation omitted). Moreover, the statute explicitly equates participation in a "local government risk pool" with the purchase of insurance for the purposes of a city's immunity from liability. *See* G.S. § 160A-485(a); *see also* Comment, *Waiving Local Government Immunity in North Carolina: Risk Management Programs **are** Insurance*, 27 Wake Forest L. Rev. 709, 731 (1992) ("The rationale underlying this amendment [legislatively declaring local government risk pools as the equivalent of liability insurance] is sound: once local government funds are pooled, the third party administrator of the pool acts as the insurer, paying the claims from a centralized fund.").

Thus, G.S. § 160A-485(a) provides two methods by which a municipality may waive governmental immunity—(1) purchase of liability insurance covering the particular claim, or (2) joining a "local government risk pool." The City asserts it "has taken neither action."

We first consider whether the City was a participant in a "local government risk pool" at the time of Lyles' death. "Article 23 of General Statute Chapter 58" provides in relevant part as follows:

[T]wo or more local governments may enter into contracts or agreements pursuant to this Article for [1] the joint purchasing of insurance or [2] to pool retention of their risks for property losses and liability claims and to provide for the payment of such losses of or claims made against any member of the pool on a cooperative or contract basis with one another, or may enter into a trust agreement to carry out the provisions of this Article.

N.C. Gen. Stat. § 58-23-5 (1994).

The City reads the above-quoted section as signifying that in order for an agreement between governmental entities to be considered a "local government risk pool," the agreement must be entered into for the specific purpose of either (1) the joint purchase of insurance, or (2) the pooling of funds on a cooperative or contract basis for payment of claims brought against pool members.

Plaintiff counters that the "requisite characteristic of a risk pool . . . is the participation of two or more local governments in a joint risk management program, providing for the 'payment of such losses of or claims made against any member of the pool on a cooperative or contract basis with one another.' " In other words, according to plaintiff, the statute restricts neither the manner in which municipalities choose to organize pools nor the purposes for which those pools may be established. *See generally* Comment, *Waiving Local Government Immunity in North Carolina: Risk Management Programs* **are** *Insurance, supra* at 711.

However, we need not resolve directly the parties' disagreement over how best to read G.S. § 58-23-5. Even utilizing the City's narrower interpretation of the section, we conclude the risk management program in which the City participates falls within the scope of the statute.

The City contends the affidavits it submitted to the trial court established that it neither purchased insurance jointly nor pooled retention of risks under the contractual "risk management operations" entered into by the City in 1988 with Mecklenberg County (the County) and the Charlotte-Mecklenburg Board of Education (the Board). Thus, the City's argument continues, governmental immunity was not waived by its participation in a "local government risk pool" at the time of Lyles' death.

The City in particular points to Gaskins' affidavit discussing specifics of the risk management program entered into by the City, the County and the Board, as compared with the organization and operation of the North Carolina League of Municipalities (the League) risk coverage program described in detail by Weber in his affidavit.

For example, regarding "local government risk pools" generally, Weber stated:

> A local government risk pool permits a group of municipalities to join together to purchase insurance or to pool their funds on a cooperative basis for the purposes of paying claims made against members of the pool. *A key feature of a risk pool is the sharing of risk by the participants in the pool.*

(Emphasis added). Under the League's program, for instance, each participant initially contributes an actuarially determined amount into the pool. Thereafter, funds from the pool are used to pay claims brought against any member up to a previously fixed amount ($250,000.00 under the League's plan). For coverage of claims exceed-

ing that amount, the League purchases reinsurance on behalf of all participants.

Upon commencement of each fiscal year, the annual contribution of each entity is recalculated with reference to "exposures and experience" in the previous year. No individual member of the League is reassessed an additional amount during that year, however, regardless of the number or dollar amount of claims ultimately brought against it. If further assessments become necessary during a given year, they are lodged against all participants based upon their *pro rata* contributions at the beginning of that fiscal year. As Weber explained:

It is in this fashion that the municipalities share risk. No one city faces unlimited exposure. The group of cities collectively bear the risk that one (or more) cities will receive and pay claims exceeding the amount that that city (or cities) contributed to the pool at the beginning of the year.

In contrast, the City contends the "claims and risk management unit" the City has operated in conjunction with the County and the Board since March 1988 involves no sharing of risk of liability among the participating entities. Because under G.S. § 58-23-5 the sharing (or pooling) of risks either by the joint purchase of insurance or the pooling of retained risks is the "key feature" of a "local government risk pool," the City argues its program is outside the purview of the statute. *See* G.S. § 58-23-5; *see also Antiporek v. Village of Hillside*, 499 N.E.2d 1307 (Ill. 1986).

The program at issue was entered into by the City, the County and the Board on 30 March 1988 and denominated the Joint Undertaking Agreement (the Joint Agreement). It provided that the Division of Insurance and Risk Management (DIRM) of the City's Finance Department would thereafter adjust claims for damages made against the City, the County and the Board. In addition, DIRM was given authority to "exercise [all] insurance and risk management decisions" on behalf of the three participants.

The "basic structure" of the program administered by DIRM is described as "a two tiered self-insurance program . . . ." Under the first tier "[e]ach of the parties to th[e] [Joint] Agreement will finance its own loss exposures in the above areas of liability and risk by retaining the first $500,000 per occurrence of losses." Although DIRM is to "h[o]ld and invest[]" each entity's first tier contributions, "[t]hese funds will be owned by the party paying the[m] . . . with investment

income and amounts remaining at the end of each fiscal year going into [each party's] respective accounts . . . ."

Further, with regard to "those risks which can best be covered by the purchase of insurance and reinsurance," DIRM was charged ("consistent with sound risk management and financial principles") with the responsibility of purchasing each entity's insurance. However, "the parties to this Agreement . . . shall be billed in an amount equal to the net cost of the insurance and reinsurance." The City maintains the uncontradicted evidence therefore reflects no sharing of risk of liability among the participants in the Joint Agreement. First, the City asserts, because each entity pays for and maintains independent insurance policies and coverage, there is no "joint purchase" of insurance among or between the three. *See* G.S. § 58-23-5. Second, the City continues, although the participants have "consolidated their risk management operations in DIRM," each is required to keep sufficient funds in separate trust accounts from which all claims against it will be paid. For example, claims against the City are paid exclusively from the City's trust account; if that account is depleted by claims, the City alone is responsible for raising the balance to an acceptable level. Thus, the argument concludes, there is also no "pool[ed] retention of . . . risks for . . . liability claims" among or between itself, the County and the Board. *See id.*

While the City properly emphasizes the sharing or pooling of risks between entities as an essential characteristic of a "local government risk pool," we find the distinctions the City attempts to draw regarding the Joint Agreement unpersuasive.

For example, although under the Joint Agreement each participant in the City's "risk management program" a) retains the risk for the first $500,000.00 of losses and b) claims falling within that amount are paid from "Tier 1" funds set aside by and for the individual pool members, the "basic structure" of the program is nevertheless "two-tiered."

As described in the Joint Agreement:

Each of the parties will jointly establish the "Tier 2 Reserve Fund," from which losses in excess of the Tier 1 level and up to $1 million per occurrence may be paid. . . . *[A]ll monies in the Tier 2 Reserve Fund will be available to any party to this Agreement . . . .*

. . . .

> If a party has claims paid on its behalf from funds in the Tier 2 Reserve Fund taken from the account of another party, these funds will be repaid with interest . . . .

(Emphasis added). To effectuate the Joint Agreement, the City, the County and the Board also executed a Trust Agreement:

> to provide a self-insurance reserve fund from which distributions can be made to satisfy liability claims against any of the Participants . . . [and] specifically for the purpose of providing the "Tier 2 Reserve Fund" . . . . This trust will insure the loss liability of each Participant against losses exceeding $500,000 but not exceeding $1,000,000 per occurrence . . . .

As further set forth in the Trust Agreement:

> Any such payments [for Tier 2 claims] shall be made first out of the separate trust account of the Participant against whom the claim was made and the excess, if any, shall be made out of the other Participants' separate trust accounts, pro rata.

> In the event such payments completely exhaust a Participant's separate trust account and are made out of the other Participants' separate trust accounts, the Participant against whom the claim was made will . . . make sufficient additional contributions to the trust to replenish the principal amount paid out of the other Participants' separate trust accounts, plus interest . . . . Upon notice from [DIRM], the Participant shall make all reasonable efforts to make such additional contributions to the trust as may be necessary to replenish such principal amount and interest thereon within thirty (30) days after its next annual appropriation.

Thus, under the City's "risk management operations," once a participant has depleted the funds held by DIRM on its behalf for the payment of Tier 1 claims, it is entitled to dip into the "Tier 2" pool *which is funded by all participants.*

Conceding "it is technically possible for the City to use funds placed into the trust accounts by the County and the School Board to pay claims against the City," the City nonetheless attempts to minimize the significance of this obvious "risk sharing" element by insisting it has never exercised the option to borrow money from the Tier 2 pool. Further, should Tier 2 money be utilized by the City to pay claims brought against it, the City points out it would be obligated to repay that amount, plus interest. Therefore, the City concludes, since "all claims against the City that are satisfied through the use of funds

placed in the Tier 2 fund are ultimately paid by the City," there is "no sharing of risk."

However, the City's assertions cannot be sustained. First, the City's failure to exercise the option of using Tier 2 funds does not detract from the nature of the Tier 2 pool itself and is immaterial for purposes of characterizing the City's arrangement. In addition, as plaintiff notes, "[t]he purpose of this fund could only be to provide a means for its members to pay claims with other members' money." As such, one of the component parts of the Joint Agreement provides a mechanism by which participants may "pool retention of their risks for property losses and liability claims and . . . provide for the payment of such losses of or claims made against any member of the pool on a cooperative or contract basis with one another," *see* G.S. § 58-23-5, albeit with an eventual obligation to repay the pool. *See* Trust Agreement ¶ 2.9(A.) ("Participant shall make all reasonable efforts to make such additional contributions to the trust as may be necessary to replenish such principal amount and interest thereon within thirty (30) days after its next annual appropriation.").

Based on the foregoing, we conclude the City was indeed a participant in a "local government risk pool" on the date of Lyles' death and thereby waived the right to assert governmental immunity in bar to plaintiff's claim. *See* G.S. § 160A-485(a). The trial court therefore properly denied the City's motion for summary judgment grounded upon the defense of immunity.

Affirmed.

Judges GREENE and WYNN concur.